**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD R. KOTOWSKI, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JGM FABRICATORS & ERECTORS, | : | NO. 18-1512 |
| INC., et al., | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

TIMOTHY R. RICE                                                                July 30, 2019
U.S. MAGISTRATE JUDGE

I must determine whether Plaintiff Richard Kotowski, a high-ranking construction

company executive earning $150,000 annually, plus bonus, is entitled to overtime wages because

he was required to perform manual labor as his primary job duty. I find by a preponderance of

the evidence that Kotowski worked primarily, and almost exclusively, in an executive capacity

that is exempt from overtime compensation.

My factual findings, as enumerated below, see Fed. R. Civ. P. 52(a), are informed by my

credibility findings of several key witnesses. I have measured their testimony against other

evidence and documents and assessed their demeanor, bias, and candor while testifying. I

discredit Kotowski's testimony as embellished and exaggerated based upon his demeanor. I also

discredit the testimony of Michael Weyant based upon his apparent bias and evidence of his poor

reputation for truthfulness. See Fed. R. Evid. 608(a); see also N.T. 3/13/2019 at 40–42; N.T.

3/14/2019 at 64.

I credit the testimony of Brian Sell and Kim Gunther, both of whom conceded

information helpful to Kotowski, but also largely contradicted Kotowski. I also credit the

testimony of Joseph Messner, Jr., who corroborated the testimony of Sell and Gunther. I

acknowledge the potential bias of Sell, Gunther, and Messner, Jr., based upon their status as employees of Defendant JGM Fabricators & Erectors, Inc. ("JGM"). Nevertheless, their testimony is corroborated by documents and by the inherent nature of the work performed in the steel construction industry. For example, the type of complex construction involved here could not have been timely completed unless Kotowski functioned in a leadership role, as contemplated by his terms of employment. <u>See</u> Pl. Ex. ("P") 1. Although Kotowski and others, including Messner, Jr., occasionally were required to assist with manual labor or emergency tasks, such instances were the exception to Kotowski's primary role as a well-compensated and essential executive with managerial responsibilities.

## FINDINGS OF FACT[1]

1. On June 10, 2015, JGM offered Kotowski the position of director of field construction services, P1; N.T. 3/12/2019 at 147; N.T. 3/13/2019 at 46, at an annual salary of $150,000, plus potential bonus of up to 20% of his salary, P1.

2. Kotowski accepted, and worked at JGM from June 2015 until March 2018. <u>Id.</u>; N.T. 3/11/19 at 47. He reported directly to Joseph Messner, Jr., president and chief executive officer ("CEO") of JGM. P1; N.T. 3/13/2019 at 165; N.T. 3/14/2019 at 7; Stip. ¶¶ 5–6.

3. Kotowski's offer letter stated that his responsibilities included: "Business development, estimating, Safety/training and management of all field operations and employees. Assist in the strategic planning and direction for the growth of the company." P1 (errors in original).

4. JGM and Messner, Jr. hired Kotowski with the expectation that Kotowski would not perform manual labor. N.T. 3/14/19 at 12–13. Likewise, Kotowski did not expect or desire to

---

[1]      All facts are found by a preponderance of the evidence.

perform manual labor. Kotowski believed he was hired to oversee the field construction services division and perform the duties outlined in his offer letter. N.T. 3/11/19 at 46–47.

JGM's Business

5. JGM provides industrial construction and steel fabrication services. Stip. ¶ 4; N.T. 3/13/2019 at 124. The field construction services division generally provides labor for JGM projects. N.T. 3/13/2019 at 11–12.

6. JGM typically uses several manual laborers, who are the primary source of direct work on a project; one or more forepersons, who oversee a crew of laborers and assist in the direct work; and one or more superintendents, who coordinate things as scheduling and budget, oversee crews, and sometimes assist in the direct work. Id. at 18; N.T. 3/11/2019 at 78; N.T. 3/12/2019 at 96. Staffing varies depending on the size of the job. N.T. 3/13/2019 at 11–12. JGM directly employs some laborers on a permanent basis and obtains others on a temporary basis from staffing companies such as Tradesmen International. Id. at 122; N.T. 3/11/2019 at 77, 196–97.

7. As director of field construction services, Kotowski typically oversaw each entire project, which included directing the work of up to 35 employees. N.T. 3/11/2019 at 197; N.T. 3/12/2019 at 17, 133; N.T. 3/13/2019 at 138; Stip. ¶ 8.

8. During Kotowski's tenure with JGM, Joe Messner, Jr. earned an annual salary of $150,000, N.T. 3/18/2019 at 10, and J.P. Messner, director of estimating, made $110,000. N.T. 3/12/2019 at 156. Superintendents earned an annual salary of around $110,000 without overtime, id. at 57, but currently, JGM superintendents are hourly employees, making $35 per hour plus overtime, N.T. 3/13/2019 at 47, 145. In 2018, JGM superintendent Brian Sell earned

$103,000, or approximately $1,980 per week, including approximately ten hours per week of overtime pay.  Id. at 47–48; cf. N.T. 3/14/2019 at 56–57 (Sell's 2016 hours).

Kotowski's Tenure with JGM

9.   While employed with JGM, Kotowski earned the $150,000 salary reflected in his offer letter, or approximately $2,885.00 per week, with no overtime pay.  N.T. 3/11/2019 at 47; Stip. ¶ 7.  He also was provided a vehicle and phone.  N.T. 3/11/2019 at 158.

10. Kotowski provided Messner, Jr. with his contact list, which consisted of approximately 1,100 contacts accumulated over his time employed with other companies.  Id. at 126.  Messner, Jr. told Kotowski that JGM employees would "cold call" the contacts and leverage Kotowski's relationships to obtain business for JGM.  Id.

11. Kotowski also made several phone calls to potential clients to try to secure business. Id. at 127–29.  Kotowski helped JGM obtain work for the company Clorox through one of these calls.  Id. at 125; N.T. 3/14/2019 at 84.  Messner, Jr. did not direct Kotowski to call Clorox; rather, Kotowski did this on his own following a conversation with Messner, Jr. about contacts to target as potential clients.  N.T. 3/11/2019 at 124.

12. Kotowski went to lunch with contacts at Adjunct Technology and Agilent, but those meetings did not result in JGM business.  Id. at 127–28.  Similarly, Kotowski had meetings at Croda, Pittsburgh Tank, and Formosa, none of which resulted in JGM business.  Id.; N.T. 3/14/2019 at 82.  Kotowski also called a contact at the Port of Wilmington twice, and made a site visit once, but these efforts similarly did not result in JGM business.  N.T. 3/11/2019 at 129.

13. Kotowski undertook an initiative to hire additional skilled workers for JGM, including ordering magnets for employees' trucks that advertised JGM was hiring.  Id. at 192. He also provided JGM with job descriptions from his previous company so that JGM could use

4

them in posting available positions.  N.T. 3/14/2019 at 19.

14. Kotowski had a desk at JGM's headquarters in Coatesville, Pennsylvania, where he completed administrative tasks.  N.T. 3/11/2019 at 224; N.T. 3/13/2019 at 129–30.  The amount of time Kotowski spent at his desk varied, but he generally spent between one and three days per week there from 6 a.m. until 2:30 p.m., or on average, eight hours per day.[2]  N.T. 3/13/2019 at 131–32; see also N.T. 3/14/2019 at 89 (Kotowski spent 30–40% of his time in the office).

15. Kotowski routinely participated in project kickoff meetings at JGM headquarters. N.T. 3/11/2019 at 185–86; N.T. 3/13/2019 at 89–91.  At these meetings, JGM personnel would discuss an upcoming project and its estimate, including the schedule according to which the work was to be completed and the manpower, labor, tools, and equipment built into the estimate. N.T. 3/13/2019 at 89–91.  These meetings varied in length, but typically lasted about an hour. Id. at 152.

16. Kotowski also attended occasional company meetings and monthly safety meetings held at JGM headquarters.  N.T. 3/11/2019 at 85–86.

17. Kotowski was responsible for certain trainings, including CPR certification and MSHA (Miner Safety)[3] training, that he completed at the JGM office.  Id. at 86, 89–90; P5 at JGM80–82.

---

[2]     Kotowski testified that he went to JGM headquarters only at the beginning of new projects to prepare the project binder, which took between one and four hours.  N.T. 3/11/2019 at 84–85; see also N.T. 3/15/2019 at 49 (Kotowski was at the office "hardly at all.").  However, Kotowski also testified that he went to the office for such things as company meetings, safety meetings, trainings, and interviews.  N.T. 3/11/2019 at 85–86 132–33.  Given this testimony, and the testimony of Kim Gunther and Joe Messner, Jr. that Kotowski spent more time in the office than he suggests, I find Kotowski's testimony that he was rarely in the office not credible.  N.T. 3/13/2019 at 131–32; N.T. 3/14/2019 at 44.

[3]     Kotowski argues that his MSHA certification was obtained because he performed manual labor on-site at projects located at surface mines.  N.T. 3/11/2019 at 86–89.  Because anyone on-

18. Kim Gunther, a JGM project management employee, served as a coordinator for field construction services and reported directly to Kotowski. N.T. 3/13/2019 at 83–85, 93, 119. Gunther assisted Kotowski with ordering equipment, machinery, job trailers, and safety equipment for projects. Id. at 90, 92; N.T. 3/12/2019 at 151; N.T. 3/18/2019 at 29. Kotowski's completion of those tasks was essential to JGM's success. N.T. 3/18/2019 at 30–31 (Kotowski's successor testifying those tasks were essential); N.T. 3/14/2019 at 67.

19. Gunther also was required to submit vendor invoices to Kotowski and could not process the invoices for payment without Kotowski's approval. N.T. 3/13/2019 at 93–94. No further approval was necessary for those invoices; Kotowski had final authority.[4] Id. at 94.

20. Kotowski was responsible for approving paid time off ("PTO") requests for all field employees.[5] Id. at 97; N.T. 3/11/2019 at 170–71; e.g., Def. Ex. ("D") 5 at 1–2. Kotowski also had authority to deny PTO. N.T. 3/11/2019 at 174; e.g., D5 at 3–4.

21. Kotowski conducted performance reviews for all superintendents and forepersons, as well as many laborers, although superintendents also sometimes performed laborer reviews. N.T. 3/13/2019 at 113.

---

site at those locations required the certification, including supervisors and managers who would not engage in any manual labor, see N.T. 3/13/2019 at 136–37, 141; N.T. 3/14/2019 at 60–61, Kotowski's MSHA-certification does not necessarily mean he was performing manual labor on projects.

[4] Although he conceded he had authority to order equipment at his own discretion, Kotowski claimed that Messner, Jr. retained authority to overrule his decisions. N.T. 3/11/2019 at 187. However, Kotowski testified about only one time where Messner, Jr. requested use of a different vendor for a crane rental. Id. at 188. This instance does not establish that Messner, Jr. required final sign-off on all ordering decisions.

[5] Kotowski claims PTO requests still needed to be approved by Messner, Jr. Id. at 172. I find this assertion not credible given that Kotowski's signature appears on the PTO requests under "Manager Approval," e.g., D5 at 1–2, and given Gunther's testimony that Kotowski had the final say on PTO requests from his direct report employees, N.T. 3/13/2019 at 97.

22. At least initially, Kotowski maintained master lists of JGM's equipment resources and personnel. D8, Att. 1 at 2–3; N.T. 3/14/2019 at 27–28. The master manpower list depicted categories of JGM employees, such as office-administration, sales/estimating, field, and shop. D8, Att. 1 at 3. Kotowski listed himself in the office/administration category, rather than the field category. Id.; N.T. 3/18/2019 at 28–29.

23. Kotowski also implemented a weekly manpower schedule, which depicted all ongoing JGM jobs and their assigned workers, along with employees in other divisions of the company, such as office employees. D8, Att. 1 at 4 (manpower schedule"); N.T. 3/13/2019 at 89–90. Kotowski listed himself under the category "office" and not under any of the active projects. D8, Att. 1 at 4. Kotowski also implemented a monthly labor master plan, which depicted JGM's active and upcoming projects in detail with corresponding dates, completion percentages, and estimated remaining manpower hours. D8, Att. 2 at 5 (labor master plan); N.T. 3/18/2019 at 46–47. Kotowski stopped preparing these documents in late 2015. N.T. 3/18/2019 at 47.

24. Kotowski directed Gunther to locate employees when he wanted to hire both skilled JGM employees and laborers from agencies such as Tradesmen International.[6] Id. at 29; N.T. 3/13/2019 at 99. When they needed to hire direct JGM employees, Gunther provided resumes to Kotowski, who would decide whether to request an interview. N.T. 3/13/2019 at 100; N.T. 3/11/2019 at 194–95, D7 (emails from Kotowski responding "no" or "looks good" in response to candidates provided by Gunther). Gunther then coordinated interviews and Kotowski, or another JGM executive in his absence, conducted the interviews. N.T. 3/13/2019 at 101–02; N.T.

---

[6]      Superintendents and sometimes forepersons could also make requests for additional Tradesmen laborers. Id. at 155.

3/11/2019 at 194–95; D7.  Gunther also coordinated hiring additional employees from Tradesmen at Kotowski's direction.[7]  N.T. 3/13/2019 at 104–05.

25. Although Messner, Jr. could overrule his decisions, Kotowski generally had independent hiring authority.[8]  Id. at 101–02; N.T. 3/12/2019 at 17; see also N.T. 3/13/2019 at 10–11 (Kotowski offered JGM superintendent Brian Sell a job immediately after interview). Kotowski also would direct Gunther when he wanted to extend an offer to an employee and confirm the terms of those offers, including pay rate.  N.T. 3/13/2019 at 102–03.

26. Kotowski, as well as project superintendents and forepersons, held authority to terminate Tradesmen laborers, and Kotowski could also terminate JGM employees.[9]  Id. at 107–08; N.T. 3/11/2019 at 134, 202; N.T. 3/12/2019 at 17.

27. Kotowski generally had authority to grant raises, often arising out of performance

---

[7]     Kotowski argues that JGM had difficulty retaining skilled laborers and hiring laborers from agencies like Tradesmen for a variety of reasons.  See, e.g., N.T. 3/11/2019 at 201. Gunther, however, testified that Tradesmen generally was able to supply the employees JGM needed, N.T. 3/13/2019 at 108–09, and Dominic Bonura, Kotowski's successor, testified that he faced none of the difficulties Kotowski cited, N.T. 3/18/2019 at 29–30.

[8]     Kotowski testified that he never hired anyone entirely by himself and ultimate authority rested with Messner, Jr.  N.T. 3/11/2019 at 130–32.  However, Kotowski also conceded that he interviewed and made recommendations on hiring many employees, id. at 132–33, 207, and Messner, Jr., Gunther, and Sell testified that Kotowski did have hiring authority.  N.T. 3/13/2019 at 10–11, 101–02; N.T. 3/12/2019 at 17–18.  Further, Messner, Jr. testified that he never hired anyone for field operations without Kotowski's input.  N.T. 3/12/2019 at 18.  I find the respective testimony of Messner, Jr., Gunther, and Sell credible, and conclude that Kotowski had authority to hire employees, which he did on several occasions.

[9]     Kotowski claims he did not have authority to hire, fire, or grant raises or promotions, and that all decisions had to be approved by Messner, Jr.  N.T. 3/18/2019 at 50–51.  Kotowski, however, points to only isolated incidents where Messner, Jr. intervened in such decisions, such as when Messner, Jr. opted to allow an employee suffering from drug abuse to obtain treatment and return to work once clean, rather than fire him.  Id. at 51.  Occasional objections by the company's CEO for legitimate reasons do not contradict that Kotowski had wide discretion to make these personnel decisions.

reviews. N.T. 3/12/2019 at 17; N.T. 3/13/2019 at 23–24, 36, 113. He also granted raises in

response to employee requests when he thought it was appropriate. See, e.g., N.T. 3/13/2019 at

36, 113. Although Messner, Jr. objected to granting certain individuals raises in rare instances,

Kotowski generally handled such matters at his own discretion.[10] N.T. 3/18/2019 at 10–11.

28. Kotowski had authority to promote field employees and did so on at least two

occasions. N.T 3/11/2019 at 183–84; N.T. 3/12/2019 at 17.

29. Kotowski also participated in estimating, or compiling project components to develop

an overall cost and budget for completing a project.[11] N.T. 3/12/2019 at 147–48; D2. Director

of estimating J.P. Messner always worked with the individual running field construction services

to prepare these estimates. N.T. 3/12/2019 at 149. Kotowski worked with J.P. to estimate labor

hours and equipment needs, along with a timeline for a particular project. Id. at 148. Part of the

estimating process was doing project walk-throughs, during which Kotowski and J.P. traveled to

job sites, met with customers, and walked through the project sites to ensure the schedule and

---

[10] Kotowski testified that there were "[f]our or five times" he wanted to grant an employee raise, but was overruled by Messner, Jr. Id. at 51. Kotowski detailed only one such instance, when he wanted to give Mike Weyant a $22,000 bonus, but Messner, Jr. disallowed it. Id. at 51–52. Messner, Jr., however, clarified that despite wanting to grant Weyant a bonus of only $10,000–$12,000, he agreed to grant him a $18,000 bonus instead, based upon Kotowski's opinion that Weyant may leave JGM if given a lower bonus. Id. at 6.

[11] Kotowski first testified that he participated in estimating for one project only, which took half a day. N.T. 3/11/2019 at 123. Beyond that, he said he responded to J.P.'s questions regarding how much labor or what types of equipment were needed for projects over the phone, amounting to only about four hours total in his entire tenure with JGM. Id. at 123–24. Later, however, Kotowski acknowledged he had "helped" in estimating three projects: Preferred Sands, Bootsy, and a third which he could not recall. Id. at 242–43. However, in addition to those contradictions and Kotowski's own acknowledgements, J.P. testified that Kotowski participated in estimating, N.T. 3/12/2019 at 148–50, and that testimony was corroborated by Gunther, N.T. 3/13/2019 at 127. Although Kotowski may not have prepared estimates himself, he played an important role in the process, which was integral to bids being prepared accurately. See N.T. 3/12/2019 at 149. His own LinkedIn profile reflected this, stating that he "assist[ed] in preparation of estimates." D2; see infra ¶ 36. For these reasons, I credit the testimony of J.P. and Gunther regarding Kotowski's participation in estimating.

labor were appropriate and Kotowski had an adequate understanding of the project scope, which he could communicate to his superintendents. Id. at 150; N.T. 3/11/2019 at 225. The job site visits varied in length, but could last an entire day. N.T. 3/12/2019 at 159. Once the projects began, Kotowski had continued communication with J.P. regarding issues, for example, incorporation of work outside of the original project scope. Id. at 150–51.

30. Kotowski participated in estimating approximately 80% of the 100 to 120 projects for which JGM submitted bids. Id at 149. The estimates could not have been prepared without Kotowski's input and/or approval. Id.

31. Kotowski also traveled to job sites to ensure compliance with company policies and safety, adherence to project schedules, and quality control. N.T. 3/11/2019 at 73. While on a job site, Kotowski typically led an hour-long crew meeting to begin the workday, during which he went over necessary safety equipment and daily goals, divided laborers into teams, and issued daily assignments. Id.; see also N.T. 3/14/2019 at 87–88 (detailing Kotowski's daily involvement in ensuring job site safety). Kotowski would then monitor the project site to ensure the crews were in place and had the necessary tools, equipment, and materials. N.T. 3/11/2019 at 73. He would inspect each crew's tasks, and sometimes step in to address errors or direct laborers' techniques if there was confusion on how something was to be done. Id. at 74; N.T. 3/13/2019 at 32. Once the daily work was completed, Kotowski would spend about two hours inspecting each crew's work, assessing whether daily goals were met, and planning the next day's work, which included setting goals and determining what tools and equipment were needed. N.T. 3/11/2019 at 81–82.

32. On large projects with multiple crews, Kotowski would sometimes lead a crew himself, during which he supervised and directed the work of laborers. Id. at 78–81.

Sometimes, but not regularly, he would perform manual labor to increase efficiency and speed of completion.[12]  See id.; see also N.T. 3/13/2019 at 8, 16–17 (Kotowski "would chip in a hand . . . . if we're wrapping up or cleaning up," but "it's just not truthful that he was a field worker"); N.T. 3/14/2019 at 33 (Kotowski helped tighten bolts on Amazon project).

33. J.P., Bonura, and Sell each observed Kotowski on job sites doing such things as working in job trailers, discussing work on-site with superintendents, directing employees' work, meeting with clients, and performing other management duties.  See N.T. 3/12/2019 at 153; N.T. 3/13/2019 at 15–17, 29–30; N.T. 3/18/2019 at 26, 42.

34. Kotowski had the freedom to dictate his own schedule, although there were times he was directed by Messner, Jr. to visit certain job sites because of extraordinary circumstances. See D7 at JGM13975–76, P11 at JGM8030 (emails from Messner, Jr. asking where Kotowski would be located on particular days); N.T. 3/13/2019 at 113 (Messner, Jr. did not micromanage Kotowski); see also, e.g., N.T. 3/14/2019 at 32, N.T. 3/11/2019 at 51 (Messner, Jr. directed Kotowski to relieve him as project lead at the Pepperidge Farm job site, Kotowski's first project for JGM) and 97 (Messner, Jr. directed Kotowski to go on-site at Amazon because the superintendent at that project was not getting things timely installed).

35. JGM employees were not always able to easily locate Kotowski because he was traveling between job sites and the JGM office, or for other reasons.  N.T. 3/13/2019 at 115; N.T. 3/12/2019 at 153–54.

36. As of the date of trial, Kotowski's LinkedIn profile stated the following summary of his experience with JGM:

---

[12]     While Kotowski sometimes assisted with manual labor when necessary, I do not find that he performed manual labor six to eight hours a day, six days a week, as he alleges, see N.T. 3/11/2019 at 78–80.

> Perform work associated with setting up projects. Company Scheduling of all man power & equipment for all projects and maintenance, rigging, emergency & fast paced projects, and shutdowns, Supervise project scopes including heavy rigging, millwright work, process piping, structural repairs, structural steel install, . Supervision includes assisting in preparation of estimates, project cost control and scheduling.
> Generate long term manpower schedules for entire field and sop. Including all company capital and maintenance projects for a wide variety of customers throughout the U.S.

D2 (errors in original). Despite contending that he did not write this LinkedIn summary, Kotowski knew it was publicly posted and allowed it to remain posted from 2014 until 2019. N.T. 3/11/2019 at 162–63. Such conduct establishes his endorsement of the content, and is consistent with other evidence.

37. Kotowski's duties such as ordering, scheduling, and directing employee work were crucial to JGM success because additional manual laborers could always be obtained from Tradesmen or similar agencies. N.T. 3/13/2019 at 53–55 (Sell testimony); N.T. 3/14/2019 at 12–13, 67–68 (Messner, Jr. testimony); N.T. 3/18/2019 at 30–31 (Bonura testimony). However, without a director of field construction services, no one would be in the position to make high-level executive decisions that impacted the entire enterprise. N.T. 3/13/2019 at 53–55; N.T. 3/14/2019 at 12–13, 67–68; N.T. 3/18/2019 at 30–31.

38. Kotowski was terminated by JGM on March 3, 2018. N.T. 3/11/2019 at 122.

## CONCLUSIONS OF LAW

1.     Kotowski claims that while employed with JGM, he regularly worked more than forty hours per week but was never paid overtime in violation of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 et seq., and Pennsylvania Minimum Wage Act of 1968 ("PMWA"), 43 Pa. Stat. § 333.101 et seq. He seeks back pay damages in the amount of his

unpaid overtime compensation, liquidated damages, pre- and post-judgment interest, costs, expenses, and fees.  Compl. (doc. 1) at 11.

2.      Both the FLSA and PMWA entitle an employee who works more than forty hours in a week to receive overtime pay at a rate of "at least one and one-half times the employee's regular wage for hours worked in excess of forty hours per week."  29 U.S.C. §§ 206, 207; 43 Pa. Stat. § 333.104(c).

3.      Kotowski has presented a prima facie case of unpaid overtime under the FLSA and the PMWA: (1) Kotowski was employed by JGM; (2) JGM was engaged in interstate commerce; (3) Kotowski worked over forty hours in at least one workweek; and (4) Kotowski was paid an annual salary of $150,000, plus bonus, without overtime compensation.  Stip. ¶¶ 1– 3; Findings of Fact ("FOF") ¶¶ 1, 9; see also 29 U.S.C. § 207 (a)(2); Baum v. Astrazeneca LP, 372 F. App'x 246, 248 n.4 (3d Cir. 2010) (PMWA claims apply FLSA case law).

4.      Executive employees are exempt from the overtime provisions of the FLSA and the PMWA.  29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.100(a); 43 Pa. Stat. § 333.105(a)(5).  Those exemptions are to be construed fairly, not narrowly or against the employer, because the FLSA does not "pursue its remedial purpose at all costs."  Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks and citation omitted).[13]  JGM must establish by a preponderance of the evidence that Kotowski falls under an exemption.  Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008).

5.      JGM argues Kotowski was an executive employee exempt from overtime

_____

[13]    Encino dispensed with the requirement that FLSA exemptions be narrowly construed, 138 S. Ct. at 1142, but did not discuss whether an employer still must prove an employee is "plainly and unmistakably within [an exemption's] terms and spirit," Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 390 (1960).  Assuming the requirement still applies, Kotowski's management responsibilities render him "plainly and unmistakably" an executive employee, as contemplated by the FLSA.  Id.

provisions of the FLSA and the PMWA. Def. Proposed Conclusions of Law ("Def. COL") ¶ 25.

JGM must prove: (1) Kotowski earned at least $455 per week; (2) his "primary duty was

management of the enterprise . . . or of a customarily recognized department or subdivision

thereof"; (3) he "customarily and regularly direct[ed] the work of two or more other employees";

and (4) he had authority to hire or fire employees, or his recommendations as to the hiring, firing,

advancement, or promotion of employees were given particular weight.[14] 29 C.F.R. §

541.100(a); Vanstory-Frazier v. CHHS Hospital Company, LLC, No. 08-3910, 2010 WL 22770,

at *9 (E.D. Pa. Jan. 4, 2010) (same analysis applied to FLSA exemption as PMWA exemption).

6.      The parties dispute only Kotowski's (2) primary duties and (4) hiring/firing

authority in his position with JGM. See Stip. ¶¶ 7–8; FOF ¶¶ 7, 9.

Primary Duty

7.      To fall under the executive exemption, Kotowski's primary duty must have been

"management of the enterprise . . . or of a customarily recognized department or subdivision

thereof." 29 C.F.R. § 541.100(a).

8.      Field construction services is a "customarily recognized department" of JGM.

P1.

9.      "Primary duty" means the "principal, main, major or most important duty" when

considering Kotowski's job as a whole. 29 C.F.R. § 541.700(a). To be executively exempt,

Kotowski's primary duty must have been the performance of exempt work, i.e., management.

Id. Factors considered include: (1) the relative importance of Kotowski's exempt duties as

compared to his nonexempt duties; (2) the amount of time he spent on exempt duties as

---

[14]     The Department of Labor revised its regulations implementing the FLSA's white-collar overtime pay exemptions in 2004. The revised regulations have been enjoined nationwide, and the pre-revision regulations remain controlling. Nevada v. United States Dep't of Labor, 218 F. Supp. 3d 520, 534 (E.D. Tex. Nov. 22, 2016).

compared to nonexempt duties; (3) his freedom from direct supervision; and (4) his salary as compared to the salary of nonexempt employees performing the same nonexempt duties as Kotowski performed.  Id.

10.    "Management" of the enterprise includes interviewing, selecting, and training employees; setting employees' pay rates and schedules; directing employees' work; conducting performance reviews; providing for employee safety; and planning work techniques, assignments, equipment, and supplies.  29 C.F.R. § 541.102.

11.    As director of field construction services, Kotowski routinely performed the following "management" tasks: ordering equipment and materials; approving invoices and PTO requests; conducting performance reviews; scheduling manpower; selecting, interviewing, and hiring job candidates; granting raises; promoting and terminating employees; and assisting in preparing estimates.  FOF ¶¶ 19–30.  Kotowski also was involved with business development in providing JGM with his contacts, attending prospective client meetings, and making phone calls on JGM's behalf.  Id. ¶¶ 10–12.  On job sites, Kotowski oversaw all JGM field employees; held safety meetings; supervised and directed laborers' work; assessed project completion and scheduling; and planned for the following day's work.  Id. ¶¶ 7, 31–33.

12.    Kotowski relies on Cotten v. HFS-USA, Inc., 620 F. Supp. 2d 1342, 1347–50 (M.D. Fla. 2009) to dispute the categorization of these tasks as exempt work.  Pl. Proposed Conclusions of Law ("Pl. COL") (doc. 65) ¶¶ 15–19.  Despite the similar construction industry context, Cotten concerns the administrative, not the executive, exemption[15] and is factually

---

[15]    An employee is administratively exempt when "he is compensated at a rate of not less than $455 per week, his primary work duty is 'the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers,' and his primary duty 'includes the exercise of discretion and independent

distinguishable.  See 620 F. Supp. 2d at 1343–46 (Cotten, a "Field Supervisor," reported to an "Operations Manager," could not approve expenses over $200, and had no involvement in estimating).  Further, Cotten is non-binding on this Court, and its categorization of tasks as exempt or non-exempt work are not controlling.  See Soehnle v. Hess Corp., 399 F. App'x 749, 750–52 (3d Cir. 2010) (store manager was executively exempt where she was responsible for hiring, firing, training, supervising, and scheduling employees).  Finally, the Cotten rationale is based on an unrealistic view of the construction industry and the respective roles of managers and laborers, especially in the field of steel fabrication.  Under Cotten, nearly every employee, regardless of pay or supervisory status, would be entitled to overtime.  Nothing in the FLSA or PMWA suggests that our legislators intended such a result.  See Zannikos v. Oil. Inspections (U.S.A.), Inc., 605 F. App'x 349, 354 (5th Cir. 2015) (finding that a broad interpretation of Cotten would render the administrative exemption "meaningless," because many employees whose primary duties directly relate to the management of customers perform the precise services offered by their employers).

### Relative Importance of Exempt Duties

13.    Kotowski's performance of management tasks was critical to JGM project success, because additional laborers could be obtained from staffing agencies like Tradesmen, but management of the entire enterprise could not be performed by an ordinary laborer or even field superintendent.  See FOF ¶¶ 18, 37.

14.    Likewise, Kotowski's participation in estimating was crucial to accurate preparation of those estimates.  Id. ¶ 30.  J.P. testified that he always needed the input of someone from Field Services to prepare an estimate.  Id.

judgment with respect to matters of significance.'"  Cotten, 620 F. Supp. 2d at 1347 (quoting 29 C.F.R. § 541.200(a)).

15.     Although Kotowski argues that he was forced to perform manual labor due to JGM's aggressive project schedules and difficulty retaining labor, Pl. COL ¶¶ 22–23, the record does not indicate that he routinely and consistently performed the amount of manual labor that he alleges,[16] see FOF ¶ 32 n.12.

16.     Kotowski also argues that because his management responsibilities went to the production of the "very product or service integral to the business operation of the employer, as opposed to tasks that are ancillary to the employer's principal service," he is ineligible for the exemption.  Pl. COL ¶ 12 (citing Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903 (3d Cir. 1991)).  This argument ignores Kotowski's significant management responsibilities relating to human resources, budgeting, scheduling, and safety, all of which arguably serve JGM as opposed to, or in addition to, JGM customers.  See FOF ¶¶ 18–30; cf. also In re Morgan Stanley Smith Barney LLC Wage and Hour Litigation, No. 11-3121, 2017 WL 772904, at *7 (D.N.J. Feb. 28, 2017) ("Plaintiffs' characterization that their performance of these tasks was 'part and parcel' to selling financial products is irrelevant.  The only relevant inquiry is whether their performance 'directly related to the management or general business operations of the employer or the employer's customers.'" (citing 29 C.F.R. § 541.200(a)(2))).

17.     This factor weighs in favor of the conclusion that Kotowski's primary duty was management.

_Amount of Time Spent on Exempt Duties_

18.     Although the amount of time spent on exempt duties is considered, "primary duty

---

[16]     This factual finding that Kotowski performed almost exclusively exempt work also undermines his reliance on Marzuq v. Cadete Enterprises, Inc., 807 F.3d 431 (1st Cir. 2015), which stands for the proposition that an employee forced to perform non-exempt work for reasons outside his or her control, even if that employee is intended to perform primarily exempt work, is ineligible for the exemption, see Pl. COL ¶¶ 25–28.  Because Kotowski was not forced to perform non-exempt work, Marzuq is inapplicable.

does not connote the most time-intensive of an employee's functions," but instead the "principal, main, major or most important duty performed by the employee, regardless of how much time he devotes to it." Soehnle v. Hess Corp., 399 F. App'x 749, 751–52 (3d Cir. 2010) (overall analysis is qualitative, not quantitative).

19.     Kotowski spent approximately 30% of his time in the office and 70% of his time on job sites. FOF ¶ 14. While in the field, he functioned as a manager, undertaking such tasks as supervising and directing laborers' work, holding safety meetings, and planning the following day's work. Id. ¶¶ 31, 33.

20.     This factor weighs in favor of the conclusion that Kotowski's primary duty was management. See Soehnle, 399 F. App'x at 751–52 (finding an employee who spent only 15% of her time on nonexempt work properly classified as exempt based on the character of her job as a whole); Simpson v. Prince Telecom, LLC, No. 14-1211, 2017 WL 1206403, at *7 (D. Del. Mar. 31, 2017) ("although Plaintiff testified that he spent most of his time in the field, a qualitative assessment reveals that Plaintiff's primary duty was management").

### _Freedom from Direct Supervision_

21.     Exempt executives generally choose whether to perform exempt or nonexempt duties at any given time, whereas nonexempt employees who sometimes perform exempt duties are usually directed to do so by a supervisor. 29 C.F.R. § 541.106(a).

22.     Kotowski argues that Messner, Jr. directed him both to remain on job sites and to perform required non-exempt work. Pl. COL ¶¶ 33–34.

23.     Kotowski was relatively free from direct supervision. He retained authority to hire, fire, and promote employees, despite occasional input from Messner. Jr. He was free to dictate his own schedule, as evidenced by multiple emails inquiring as to his whereabouts and

testimony that he was sometimes difficult to locate.  FOF ¶¶ 24–28, 34–35.

24.     Although he sometimes was directed by Messner, Jr. to visit specific job sites or perform tasks in a certain way, id. ¶ 34, occasional direction by a supervisor does not negate general flexibility and independence, see Simpson, 2017 WL 1206403, at *7 (answering to his own supervisors immaterial where plaintiff retained "authority and discretion to manage technicians and supervisors" at his facility); Itterly v. Family Dollar Stores, Inc., No. 08-1266, 2014 WL 348638, at *4 (E.D. Pa. Jan. 30, 2014) ("It is not necessary for an employee to be free from all supervision in order for a court to find that he is free from direct supervision.").

25.     This factor weighs in favor of the conclusion that Kotowski's primary duty was management.

### *Salary Comparision*

26.     Kotowski earned approximately $2,885.00 per week in 2018.  FOF ¶ 9.  Brian Sell, a superintendent, earned approximately $1,980 per week in 2018, including appropriate overtime pay.  Id. ¶ 8.  Kotowski, therefore, earned approximately 46% more than Sell.

27.     Kotowski was among the highest-paid employees at JGM, earning the same amount earned at the time by the company CEO and more than the director of estimating.  Id. ¶¶ 8–9.

28.     I need not consider Kotowski's salary projections for JGM superintendents.  See Pl. COL ¶¶ 37–38.  Sell testified as to the salary he earned as superintendent in 2018, including approximately ten overtime hours weekly, which coincided with his documented 8.6 overtime hours weekly in 2016.  FOF ¶ 8.  Kotowski agrees superintendents are "the relevant hourly comparator[s]."  Pl. COL ¶ 36.

29.     This factor weighs in favor of the conclusion that Kotowski's primary duty was

management.  See Soehnle, 2010 WL 844744, at *4 n.5 (plaintiff properly classified as exempt where she earned 30% more than hourly employees performing similar non-exempt tasks); Itterly, 2014 WL 348638, at *4 and n.2 (plaintiff properly classified as exempt where, even by his own calculations, he earned 24% more than non-exempt workers).

30.     Because all four factors weigh in favor of JGM, Kotowski's primary duty was the performance of exempt work.  29 C.F.R. § 541.700(a).

Hiring/Firing Authority

31.     To satisfy the final prong of the exemption, JGM must prove that Kotowski had authority to hire or fire employees, or his recommendations as to such matters were given "particular weight."  29 C.F.R. § 541.100(a); Vanstory-Frazier, 2010 WL 22770, at *9.

32.     I may consider whether it is part of the job description to make such recommendations, whether the recommendations pertain to individuals the employee directs and supervises, and the frequency with which such recommendations are made.  Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (citing 29 C.F.R. § 541.105).  "[The] recommendations may still be deemed to have 'particular weight' even if a higher level management's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision . . . ."  29 C.F.R. § 541.105.

33.     Kotowski argues he made only occasional suggestions regarding hiring, firing, and promotion, and JGM fails to show any "causal impact" of those suggestions.  Pl. COL ¶¶ 43–44.  I disagree.

34.     Kotowski frequently directed Gunther to conduct searches when additional field employees were needed.  FOF ¶ 24.  Gunther then provided him with potential candidates and he would approve or disapprove of scheduling interviews after reviewing their resumes.  Id.

35.     For example, just moments after interviewing Brian Sell, Kotowski offered Sell a job without consulting with Messner, Jr.  Id. ¶ 25.

36.     Kotowski conceded that he had the authority to hire individuals from Tradesmen or other staffing agencies, and also had the authority to terminate both JGM employees and Tradesmen laborers, such as in the case of safety infractions.  Id. ¶¶ 26.

37.     Even in instances where Messner, Jr. overruled Kotowski's decisions, he solicited Kotowski's opinion, as evidenced by his testimony that he would never hire a field employee without their direct supervisor's input.  Id. ¶¶ 24–25 and n. 6–7.  Messner, Jr. also decided to award Weyant a bonus of $18,000 upon Kotowski's recommendation.  Id. ¶ 27 n.10.

38.     Kotowski's recommendations as to hiring, firing, and advancement of JGM field employees were, at the very least, given particular weight.  See Hudson v. Absecon Emergency Servs., Inc., No. 14-6419, 2016 WL 5329593, at *9–10 (D.N.J. Sept. 22, 2016) (plaintiff had executive-level hiring authority even where board trustees held ultimate authority); Simpson, 2017 WL 1206403, at *8 (recommendations given particular weight where evidence showed employee had ability to discipline employees, even where supervisor made ultimate decision).

Conclusion

39.     JGM has met its burden of proving by a preponderance of the evidence that Kotowski was employed by JGM in a bona fide executive capacity pursuant to 29 U.S.C. § 213(a)(1).  Kotowski was therefore exempt from the overtime pay provisions of the FLSA and the PMWA.

An appropriate Order accompanies this Opinion.